*197 The opinion of the Court was delivered by
Dunkin, Oh.
By the ante-nuptial contract, 29th August, 1S38, it was stipulated that the covenants should become “obligatory in the event of the contemplated marriage taking effect.” No further settlement was covenanted for, or probably intended. Still, all such agreements should receive a liberal interpretation, in order to accomplish the obvious intention of the parties. The plaintiff complains that the furniture of the wife was not construed by the Chancellor to fall within the provisions of the articles, although not specified in the schedule. The preamble recites that the parties, respectively, are seized and possessed of considerable real and personal estate, “which they are desirous should be secured, ultimately, to their respective children.” The first article covenants for securing the wife’s property, “a schedule of which property is signed by the parties, bearing even- date with these presents, and is to be taken and considered as a part of this deed.” The furniture is not included in the "schedule, and the obvious conclusion is that the parties did not regard some articles of household furniture, probably to be worn out in the use, as of sufficient importance to be “ultimately secured to the children,” and were, therefore, not specified in the schedule. We are not called on, however, to speculate upon the probable views of the parties. The Court sees no cause to suppose that the omission of the furniture from the schedule was the result of accident or mistake, or that the same does not set forth a full statement of all the property which the parties who subscribed the schedule desired to have secured to their respective children.
The plaintiff, also, appeals because the decree did not declare the Redheimer tract to be vested in her under the purchase from the Sheriff, instead of establishing a lien in her favor under the bond and mortgage; while, on the other hand, the defendants insist that the bond and mortgage were given for her interest in her former husband’s estate, and were not included in the schedule, although they existed at the *198 time. These objections may be conveniently considered together. The difficulty arises from some confusion in facts and dates, rather than from any doubts as to the legal conclusions.
The real estate of John G. Blewer, the former husband of the plaintiff, was sold by James Terry, Esq., former Commissioner of Edgefield, in 1837, for partition among the heirs. These heirs consisted of his widow (the plaintiff) and four children. At the sale, the plaintiff and Peter Redheimer, her son-in-law, purchased land to the amount of $10,000, for which they gave a bond, with sureties, and a mortgage of the premises to the Commissioner. Mr. Terry says, in his evidence, that the entire sales amounted to $13,795, of which the widow’s share was $4,500, or thereabouts. Very soon after the sale, the land purchased by the plaintiff and Redheimer was equally divided between them by metes and bounds. The proportion of the bond payable by the plaintiff exceeded her share of the estate. On her subsequent intermarriage with Coleman, in August, 1838, her half of the land thus purchased from Commissioner Terry, in April, 1837, is specially described in the schedule, and also that “it had been since divided between Redheimer and herself.” At that time, she was indebted to her son, John P. Blewer, as his guardian, and otherwise, and special provision is made in the articles that her debt to her son, as well as her other debts, should be paid out of the property included in the schedule. She subsequently sold to her son the land which she had purchased at the Commissioner’s sales, and at the same price. After these transactions, to wit: on 26th September, 1842, a settlement took place, in Mr. Commissioner Terry’s office, between the heirs of John G. Blewer, deceased. This matter is explicitly set forth in Coleman’s bill (under oath) against the Bank of Hamburg; in June, 1847. He says that, at this settlement, it was ascertained and agreed that the bond given by the plaintiff and Redheimer to the Commissioner, had been fully paid, except the sum of thirteen hundred and forty-four dollars and forty- *199 two cents, which wag due by Peter Redheimer on his half of the bond — that the plaintiff was the guardian of her son, John P. Blewer, and “it was thereupon agreed that, instead of exacting the cash from the said Peter for-the balance due on said bond, which he was not then prepared to pay — that the said bond and mortgage should be delivered to your orator and oratrix towards the share of the said John P. Blewer, and should stand as a valid and effectual lien upon so much of the land in said mortgage specified as had been allotted to the said Peter Redheimer, for said balance of thirteen hundred and forty-four dollars and forty-two cents, with interest thereon,” &c. This is fully confirmed by other testimony. Among others Robert Haukison, who had married a daughter, and was present at the settlement, said: “ M rs. Coleman took Redheimer’s bond and mortgage out of the Commissioner’s hands. When he handed it to the old lady he said about $2100 was due, but that they could arrange it among themselves ; that, at this settlement, he (the witness) took a single handed note from Redheimer so that the bond might be given up to Mrs. Coleman.” He subsequently testified that “ John P. Blewer bought his mother’s share of the land before the settlement with Terry, and before he was of age — he took the land at cost — -the witness had first bargained for it — the price was upwards of $4,000. Mrs. Coleman paid her son his stiare of the estate by selling him this place; this sale threw the estate (or rather J. B. Blewer) in debt to her about $1,200, and for this the bond and mortgage were transferred to her. From this statement it is very clear that in August, 1838, the plaintiff’s outstanding bond, as co-obligor with Peter Red-heimer, to the Commissioner in Equity, was entitled to no place in a schedule of her property. Her share of the land, which was the consideration of her bond, was properly included, and constituted more than her share of the entire estate. But in consequence of the subsequent sale of her share of the land to her son, and the adjustment in the Commissioners office in September, 1842, she acquired an equitable *200 title to the balance of $1,344 42, due by Peter Redheimer on the bond, and as an incident to the mortgage of his moiety of the premises. This fell directly within the second article of the marriage contract, by which the future acquisitions of the wife were declared subject to the operation of the instrument in the same manner as the property then owned by her. If, in 1837, Peter Redheimer had given to the Commissioner his separate bond for his moiety, on which, in September, 1842, a balance of $1,344 42 was still due, and the other arrangements above detailed took place, in order to give them legal form, Mr. Terry, the Commissioner, would have assigned to J. P. Blewer, as trustee, under the marriage articles, the bond and mortgage of Redheimer for the balance due. Such is now the light in which the rights of the parties are regarded by this Court. When, in August, 1843, Coleman purchased Redheimer’s equity of redemption at Sheriff's sale, there was no merger of right between debtor and creditor, and, consequently, no extinguishment of the debt. As standing in the place of Redheimer, Coleman may have become liable to pay the bond, but he had no right, either equitable or legal, to receive the money. The strict legal title was in the obligee and mortgagee, James Terry ; but the equitable right was in the trustee of the settlement, or the beneficiaries interested, according to the provisions of the articles. The husband, Coleman, purchased the equity of redemption for himself and took the Sheriff's conveyance to himself in October of same year, and the Court agrees with the Chancellor that there is nothing to fix him with a fiduciary character in this transaction. We concur generally in the decree and the decretal orders made at the Circuit. But in taking an account of the amount due on the bond of Redheimer, the calculation of interest must be suspended from the time of the transfer, in September, 1842, until the death of Coleman, in August, 1852. According to the terms of the settlement, James B. Coleman was entitled to hold the property for the joint use and benefit of himself and wife, during their joint lives. The *201 interest, therefore, which accrued on the bond after it became part ofthe trust estate, he was entitled tc ' i iand'and receive during the coverture. From the posf ’ ^Kvhich he assumed on becoming the purchaser of the equity of redemption in August, 1843, it must be presumed that the interest, which had accrued since the transfer and which subsequently accrued until the period of his death, was extinguished and paid. With this explanation (which is not at variance with anything announced in the Circuit decree) the Circuit decree is affirmed, and the appeal dismissed.
Dargan and Wardlaw, CC., concurred.

Appeal dismissed.